**UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | |
|---|---|
| ALEX YOUNG, Individually and On Behalf of All Others Similarly Situated, | ) ) ) ) **CIVIL ACTION NO.:** _2:08-928-C_WH |
| Plaintiff, | ) ) ) **CLASS ACTION COMPLAINT** |
| vs. | ) ) ) |
| FORCE PROTECTION, INC.,  FRANK KAVANAUGH, GORDON R. McGILTON, MICHAEL MOODY, MICHAEL S. DURSKI and RAYMOND W. POLLARD, | ) ) ) ) ) ) **JURY TRIAL DEMANDED** |
| Defendants. | ) ) ) |

Plaintiff, Alex Young ("Plaintiff"), alleges the following based upon the investigation by Plaintiff's counsel, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Force Protection, Inc., ("Force Protection" or the "Company"), securities analysts' reports and advisories about the Company, and information readily available on the Internet, and Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION AND OVERVIEW**

1.     This is a federal class action on behalf of purchasers of Force Protection's common stock between August 14, 2006 and February 29, 2008, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Force Protection is a designer, developer and manufacturer of survivability equipment, predominantly ballistic- and blast-protected wheeled vehicles currently deployed by the U.S. military and its allies to support armed forces and security personnel in conflict zones. The Company's specialty vehicles are designed specifically for reconnaissance, forward command and control, and urban operations and to protect their occupants from landmines, hostile fire, and improvised explosive devices ("IEDs," commonly referred to as roadside bombs). The Company is one of the original developers and primary providers of vehicles for the U.S. military's Mine Resistant Ambush Protected, or MRAP, vehicle program.

3.      Since the inception of Sarbanes-Oxley, Force Protection maintained that it had an adequate system of internal controls over its financial reporting.  However, the Company has been repeatedly criticized for its lack of internal controls.  For instance, beginning in May 2004, the Defense Contract Audit Agency ("DCAA") issued periodic reports that were critical of the Company's finances and financial accounting system.

4.      Even after these critical reports, the Company continued to state that its internal control processes were effective.

5.      On June 27, 2007, the Company's processes were again questioned when the Department of Defense's Office of Inspector General issued a report that was critical of the Company's ability to perform government contracts; charged that the Company had continuously missed delivery deadlines; and stated that the Company did not perform as a responsible contractor.  Moreover, the report stated that other companies could have competed with certain Force Protection products in terms of faster delivery schedules and product capability.

6.      Then, on February 29, 2008 and March 3, 2008, the Company shocked investors when it announced that it would delay filing of its 2007 Annual Report and that it would restate

its financial statements for the three and nine month periods ended September 30, 2007. Additionally, the Company admitted to a multitude of internal problems, including:

- Ineffective control over the financial statements closing process;

- Ineffective controls in accounting for inventory and the associated accounts payable expenses related to the receipt of inventory;

- Insufficient complement of personnel with an appropriate level of accounting knowledge, experience with the Company, and training in the application of generally accepted accounting principles ("GAAP") in the United States; and

- Ineffective controls over the completeness and accuracy of deferred tax balances.

7.    Upon the release of the February 29, 2008 and March 3, 2008 news, the Company's shares declined $0.53 per share, or 12.9 percent, to close on March 3, 2008 at $3.58 per share, on unusually heavy trading volume. During the Class Period, shares of the Company's stock traded as high as $30.27 per share and had begun a decline since the Company and the press began to slowly release information about the Company's internal deficiencies.

8.    The Complaint alleges that, throughout the Class Period, defendants failed to disclose material adverse facts about the Company's financial well-being, business relationships, and prospects. Specifically, defendants failed to disclose or indicate the following: (1) that the Company was having persistent problems meeting delivery deadlines, which was impacting the Company's ability to compete in the MRAP market; (2) that the Company's ability to compete for government contracts was impaired, due to the Company's inadequate financial system of accounting, as evidenced by a critical report from the DCAA; (3) that the Company's financial statements were not prepared in accordance with GAAP; (4) that the Company lacked adequate internal and financial controls; and (5) that, as a result of the foregoing, the Company's financial

statements were materially false and misleading at all relevant times.

9.      As a result of defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common stock, Plaintiff and other Class Members have suffered significant losses and damages.

## JURISDICTION AND VENUE

10.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

11.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

12.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b).  Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this Judicial District.  Additionally, Force Protection's principal executive offices are located within this Judicial District.

13.     In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

14.     Plaintiff, Alex Young, as set forth in the accompanying certification, incorporated by reference herein, purchased Force Protection's common stock at artificially inflated prices during the Class Period and has been damaged thereby.

15.     Defendant Force Protection is a Nevada corporation with its principal executive offices located at 9801 Highway 78, Building No. 1, Ladson, South Carolina.

16.     Defendant Frank Kavanaugh ("Kavanaugh") was, at relevant times, the Company's Chairman of the Board of Directors until June 21, 2007.

17.     Defendant Gordon R. McGilton ("McGilton") was, at relevant times, the Company's Chief Executive Officer ("CEO") and a member of the Company's Board of Directors until January 31, 2008.

18.     Defendant Michael Moody ("Moody") was, at all relevant times, the Company's President, and was appointed Chairman and CEO of the Company on February 29, 2008.

19.     Defendant Michael S. Durski ("Durski") was, at relevant times, the Company's Chief Financial Officer ("CFO") until February 29, 2008.

20.     Defendant Raymond W. Pollard ("Pollard") was, at relevant times, the Company's Chief Operating Officer ("COO") until March 3, 2008.

21.     Defendants Kavanaugh, McGilton, Moody, Durski and Pollard are collectively referred to hereinafter as the "Individual Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Force Protection's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market. Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that

the positive representations which were being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## SUBSTANTIVE ALLEGATIONS

### Background

22.    Force Protection is a designer, developer and manufacturer of survivability equipment, predominantly ballistic- and blast-protected wheeled vehicles currently deployed by the U.S. military and its allies to support armed forces and security personnel in conflict zones. The Company's specialty vehicles are designed specifically for reconnaissance, forward command and control, and urban operations and to protect their occupants from landmines, hostile fire, and improvised explosive devices ("IEDs," commonly referred to as roadside bombs). The Company is one of the original developers and primary providers of vehicles for the U.S. military's Mine Resistant Ambush Protected, or MRAP, vehicle program.

### Materially False and Misleading Statements Issued During the Class Period

23.    The Class Period begins on August 14, 2006.  On this day, the Company filed its Quarterly Report with the SEC on Form 10-Q.  The Company's 10-Q was signed by Defendants McGilton, Kavanaugh, and Pollard.

24.    The Company's 10-Q filed on August 14, 2006 also contained Sarbanes-Oxley required certifications, signed by Defendant McGilton, who stated:

I, [Gordon McGilton] of Force Protection Corporation, certify that:

1. I have reviewed this quarterly report of Force Protection, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the small business issuer as of, and for, the periods presented in this report;

4. The small business issuer's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the small business issuer and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the small business issuer, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Evaluated the effectiveness of the small business issuer's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(c) Disclosed in this report any change in the small business issuer's internal control over financial reporting that occurred during the small business issuer's most recent fiscal quarter (the small business issuer's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the small business issuer's internal control over financial reporting; and

5. The small business issuer's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the small business issuer's auditors and the audit committee of the small business issuer's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the small business

issuer's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the small business issuer's internal control over financial reporting.

25.    On August 15, 2006, the Company issued a press release entitled "Force Protection, Inc. Announces Second Quarter Profitability and Record Sales Growth." Therein, the Company, in relevant part, stated:

> ***Force Protection, Inc. (OTCBB:FRPT) today announced record sales of $56,074,537 as part of its second quarter results for the three month period ended June 30, 2006. The company also recorded its highest quarterly gross profit to date of $10,156,786, and a net profit of $1,234,015 for the same period.*** "Our second quarter results reflect the increasing demand for our life-saving armored vehicles, and that we remain on track in FY06 in meeting that demand," said CEO Gordon McGilton. "The hard work performed by our employees to improve operations and increase production continues to pay benefits."
>
> Force Protection's net cash flow from operations for the six-month period ended June 30, 2006 was $4.0 million, compared with a loss from operations of $4.8 million during the same period in 2005. The company was also profitable for the first half of 2006, booking a year-to-date net profit of $568,382.
>
> "While we are extremely pleased to report these positive earnings, we have not lost sight of our long-term plan," said McGilton. ***"Force Protection's overarching objective is to become a high-volume supplier of the best-protected vehicles available in the world."***
>
> Force Protection's dramatic growth from a small start-up firm to a mainstream manufacturer with a workforce of more than 550 has been driven by the demand of U.S. combat engineers and explosive ordnance disposal teams for the Buffalo and Cougar mine-protected vehicles, which they credit with saving lives since 2003. A recent contract from the British Ministry of Defense for protected vehicles to support infantry patrols marks an additional expansion of the company to the international defense industry. [Emphasis added.]

26.    On November 14, 2006, the Company issued a press release entitled "Force

Protection, Inc. Announces Continued Profitability for Third Quarter." Therein, the Company, in relevant part, stated:

> Force Protection, Inc. (OTCBB: FRPT) today announced sales of $42,160,858 as part of its third quarter results for the three-month period ended September 30, 2006. ***The company recorded a quarterly gross profit of $7,918,508, and a net profit of $602,698 for the same period. Force Protection has realized year-to-date net profits of $1,171,080, generating year-to-date earnings of $0.03 per share.***
>
> "This is Force Protection's third consecutive month of operating profitability," said Vice President of Finance Richard Hamilton. "Sales for the quarter bring our 2006 cumulative year-to-date revenue total to $133,037,980, reflecting a dramatic increase from our 2005 full-year results."
>
> Force Protection was recently named South Carolina's Fastest-Growing Company in 2006. The award, based on gross revenues and employment, recognizes the top 25 companies that have contributed to the state's economy. Since their initial deployment to Iraq and Afghanistan in 2003, no fatalities have occurred in a Force Protection vehicle.
>
> "The third quarter was a period of internal growth for the company," said CEO Gordon McGilton. "We added two new vehicle production lines, improved efficiency within the facilities, and continued our workforce expansion program. ***The focus on these activities caused an anticipated short-swing dip in our third quarter revenue compared with our second quarter results, but it has positioned us to secure new contracts and handle the increased workload flowing from them.***" [Emphasis added.]

27.     Also on November 14, 2006, Force Protection filed its Quarterly Report with the SEC on Form 10-Q. The Company's 10-Q contained signatures that were substantially similar to those described in ¶ 24, *supra.*

28.     On December 15, 2006, the Company issued a press release entitled "Force Protection, Inc. Announces Review of Financial Statements; Restatement." Therein, the Company, in relevant part, stated:

*Force Protection, Inc. (the "Company") (OTCBB: FRPT) announced today that management of the Company has completed a review of its prior financial filings. In that review, the Company has discovered items which require restatement. The Company will restate the financial statements for the fiscal years ended December 31, 2003 and 2004. The Company did not give a timetable as to when the restatements would be completed.*

*The items identified by the Company relate to the valuation method used to account for certain equity issuances which did not properly include a full analysis of the embedded conversion feature associated with such issuances as required under EITF 98-5, Accounting for Convertible Securities with Beneficial Conversion Features or Contingently adjustable Conversion Ratios, or which were otherwise incorrectly valued. As a result, a number of shares of the Company's stock issued as compensation to certain executives and other third parties and recorded as general and administrative compensation expense appear to have been valued at less than fair value.*

The Company believes this issue is limited to a small number of equity issuances made during 2003 and 2004, with a total combined value of not more than $3.75 million. The Company is undertaking a careful review of its equity transactions and related financial statements in light of all applicable accounting guidelines and currently expects that it will need to restate its financial results for the years 2003 and 2004 to include additional general and administrative compensation expenses for such periods. *The Company expects that such restatement will result in a corresponding additional cumulative net loss of approximately $3.75 million for these periods. The Company believes that the restatement will not materially impact its 2006 financial results.* [Emphasis added.]

29.    On March 16, 2007, the Company issued a press release entitled "Force Protection

Reports Record Results in 2006."  Therein, the Company, in relevant part, stated:

Force Protection, Inc. (Nasdaq: FRPT) -- the leading protective vehicle manufacturer, today announced results for the fourth quarter and year ended December 31, 2006.

For the year ended December 31, 2006, the Company's net sales totaled $196.0 million. Net income was $18.2 million or $0.39 per diluted share.

In the fourth quarter of 2006, the Company's net sales totaled $62.9 million. Net income was $17.0 million or $0.32 per diluted share during the fourth quarter of 2006.

Gordon McGilton, Chief Executive Officer of Force Protection, said, *'2006 has been a milestone year in the history of Force Protection. It is the first year of profitability and a year of tremendous growth. With the completion of a $152.75 million equity offering, the appointment of several independent Board members, and the NASDAQ Stock Market listing, the Company is able to handle the rapid expansion and accommodate the continuing demand of our vehicles. We continue to focus on expediting deliveries through the efficient use of our production facilities and the collaboration of other defense industry leaders with whom we have partnered. Our mission is to produce vehicles that protect and save lives and we are committed to ensuring that those vehicles are available to protect our troops in a timely manner.'* [Emphasis added.]

30.    Also on March 16, 2007, Force Protection filed its Annual Report with the SEC on Form 10-K. The Company's 10-K was signed by the Defendants McGilton, Kavanaugh, Durski and Moody and reaffirmed the Company's financial results announced that same day. The Company's 10-K also contained Sarbanes-Oxley required certifications, signed by Defendnats McGilton and Durski, substantially similar to the certifications contained in ¶ 24, *supra*.

31.    On May 15, 2007, the Company issued a press release entitled "Force Protection Reports Record First Quarter 2007 Financial Results." Therein, the Company, in relevant part, stated:

Force Protection, Inc. (Nasdaq: FRPT), the leading armored vehicle manufacturer, today announced results for the first quarter ended March 31, 2007.

*Net sales for the first quarter ended March 31, 2007 totaled $100.2 million, an increase of 187.6% compared with $34.8 million reported during the same period in the prior year. This growth is primarily due to a significant increase in vehicle production and deliveries in several blast protected vehicle programs, reflecting contract awards received in the latter half of*

11

*2006.* These include contracts with the U.S. Marine Corps to supply Cougar Joint Explosive Ordnance Disposal Rapid Response Vehicles (JERRV), Buffalo Mine Protected Clearance Vehicles, and a contract with the British Ministry of Defense for Mastiff Protected Patrol Vehicles or Mastiff PPV.

*Force Protection recorded a gross profit for the first quarter 2007 of $21.8 million, an operating profit of $2.5 million and negative cash flows from operations of $27.2 million. Net income for the first quarter of 2007 was $2.5 million or $0.04 per diluted share, compared with a net loss of $665,633 or $(0.03) per diluted share for the same period last year.*

Gordon McGilton, Chief Executive Officer of Force Protection, said, 'We are very pleased with our results for the first quarter. *The Company is now starting to see the tangible benefits of the contract awards we received in 2006 and already, in the first quarter alone we have achieved net sales that equal nearly half of our total 2006-year net sales performance. We believe our outlook for the rest of 2007 is even brighter, given recent contract awards and the delivery orders we have already received from the U.S. Marine Corps. We intend to continue to expand our operations and remain focused on expediting deliveries through increased efficiencies at our production facilities.'* [Emphasis added.]

32.    Also on May 15, 2007, Force Protection filed its Quarterly Report with the SEC on Form 10-Q.  The Company's 10-Q reaffirmed the Company's financial results announced that same day.    The Company's 10-Q also contained Sarbanes-Oxley required certifications, substantially similar to the certifications contained in ¶ 24, *supra.*

33.    On June 11, 2007, Force Protection filed an amended Form 10-K with the SEC. The Form 10-K contained substantially similar certifications as those contained in the Company's Form 10-Q for second quarter 2006.

34.    On June 27, 2007, Force Protection filed an amended Form 10-K with the SEC. The Form 10-K contained substantially similar certifications as those contained in the Company's Form 10-Q for second quarter 2006.

35.    The statements contained in ¶¶ 23-34 were materially false and misleading when

made because defendants failed to disclose or indicate the following: (1) that the Company was having persistent problems meeting delivery deadlines, which was impacting the Company's ability to compete in the MRAP market; (2) that the Company's ability to compete for government contracts was impaired, due to the Company's inadequate financial system of accouting, as evidenced by a critical report from the DCAA; (3) that the Company's financial statements were not prepared in accordance with GAAP; (4) that the Company lacked adequate internal and financial controls; and (5) that, as a result of the foregoing, the Company's financial statements were materially false and misleading at all relevant times.

### The Truth Begins to Emerge

36.     On June 27, 2007, the Department of Defense's Office of Inspector General issued a report entitled "Procurement Policy for Armored Vehicles."  Therein, the report, in relevant part, stated:

> **Who Should Read This Report and Why?** Army and the Marine Corps acquisition and contracting personnel should read this report because it concerns armored vehicle procurement decisions that affect Global War on Terrorism mission requirements.
>
> **Background.** Congresswoman Louise M. Slaughter requested that the DoD Office of Inspector General review the DoD procurement history for body armor and armored vehicles and determine whether officials properly followed contracting policies. Congresswoman Slaughter also requested specific information on why DoD issued contracts to Force Protection, Inc., and Armor Holdings, Inc., for armored vehicles. This report addresses armored vehicles. The DoD Office of Inspector General is conducting a separate audit on body armor.
>
> Armored vehicles provide various levels of protection and are built with integrated protection or are outfitted with armor kits. This report addresses the following armored vehicles: the Buffalo Mine Protected Clearance Vehicle, the Cougar, the Joint Explosive Ordnance Disposal Rapid Response Vehicle, and the High Mobility Multipurpose Wheeled Vehicle.

**Procurement History for Armored Vehicles.** *DoD awarded 15 contracts, valued at $2.2 billion, to Force Protection, Inc., and Armor Holdings, Inc., for armored vehicles and armor kits. Specifically, DoD awarded 11 sole-source contracts, valued at $416.7 million, to Force Protection, Inc., for armored vehicles and 4 sole-source contracts, valued at $1.8 billion, to Armor Holdings, Inc., for armored vehicles and armor kits. In addition, DoD placed two orders, valued at $5.6 million, on a General Services Administration Federal supply schedule contract with Armor Holdings, Inc., for armor kits. DoD contracting and program officials stated that Force Protection, Inc., and Armor Holdings, Inc., were the only sources capable of producing the armored vehicles and meeting the urgent delivery schedules required to support the Global War on Terrorism.*

**Results.** *The Marine Corps Systems Command awarded sole-source contracts to Force Protection, Inc., for the Joint Explosive Ordnance Disposal Rapid Response Vehicle even though Marine Corps Systems Command officials knew other sources were available for competition. In addition, TACOM Life Cycle Management Command and Marine Corps Systems Command officials did not adequately justify the commercial nature of three commercial contracts with Force Protection, Inc., for the Cougar and the Buffalo Mine Protected Clearance Vehicle. As a result, the Marine Corps Systems Command continued to award contracts for armored vehicles to Force Protection, Inc., even though Force Protection, Inc., did not perform as a responsible contractor and repeatedly failed to meet contractual delivery schedules for getting vehicles to the theater. In addition, TACOM Life Cycle Management Command and Marine Corps Systems Command decisions to award commercial contracts to Force Protection, Inc., may have limited the Government's ability to ensure it paid fair and reasonable prices for the contracts. The Marine Corps Systems Command should continue to calculate and assess any additional liquidated damages for late delivery of vehicles on contract M67854-05-D-5091 and compete future contracts for the Joint Explosive Ordnance Disposal Rapid Response Vehicle. Additionally, TACOM Life Cycle Management Command contracting officials should procure future Buffalo Mine Protected Clearance Vehicles and Marine Corps Systems Command contracting officials should procure future Mine Resistant Ambush Protected vehicles under FAR Part 15 with negotiated prices based on certified cost and pricing data, and include and enforce a liquidated damages clause on future contracts with Force Protection, Inc. (finding A).*

14

The TACOM Life Cycle Management Command awarded a contract for crew protection kits to Simula Aerospace and Defense Group, Inc., an Armor Holdings, Inc., subsidiary. The subsidiary did not meet the Federal Acquisition Regulation definition of a responsible prospective contractor. Specifically, Simula Aerospace and Defense Group, Inc., did not have the necessary production control procedures, property control systems, and quality assurance measures in place to meet contract requirements for crew protection kits. As a result, the TACOM Life Cycle Management Command received crew protection kits with missing and unusable components, which increased the kit installation time and required additional reinspection of kits. In addition, the TACOM Life Cycle Management Command did not receive all of the crew protection kits in accordance with the contractual delivery schedule. Furthermore, the increased crew protection kit installation time, the additional reinspection of kits in theater, and the late deliveries all resulted in increased risk to the lives of soldiers. As of February 22, 2007, Simula delivered all items ordered on this contract; the contract remained open, however, pending several post-award audits the Defense Contract Audit Agency was conducting. The TACOM Life Cycle Management Command contracting officials should properly implement Federal Acquisition Regulation requirements to ensure that they award future contracts to responsible contractors and properly document determinations of contractor responsibility. In addition, the TACOM Life Cycle Management Command contracting officer should negotiate for consideration from Simula for late deliveries of crew protection kits and missing and nonconforming components (finding B).

TACOM Life Cycle Management Command and Marine Corps Systems Command internal controls were not adequate. We identified material internal controls weaknesses in the award of contracts to Force Protection, Inc., and Armor Holdings, Inc., for armored vehicles and armor kits. As a separate point, the Cougar and Joint Explosive Ordnance Disposal Rapid Response Vehicles have significant and operational value to our warfighters in the field. Information from users on vehicle performance indicated that vehicles performed well and saved lives.

**Management Comments and Audit Response.** The Acting Chief of Staff, TACOM Life Cycle Management Command, and the Commandant of the Marine Corps commented on finding A and concurred with the recommendations. The comments were responsive and no additional comments are required. A discussion of the management comments is in the Finding section of the report, and the complete text of the comments is in the Management Comments section. [Emphasis added.]

37.     On July 12, 2007, the *TheStreet.com* issued an article entitled "Force Protection

Shakes Off Questions."  Therein, the article, in relevant part, stated:

> Force Protection FRPT may have run into a bit of a landmine.
>
> For years, the Ladson, S.C., defense contractor monopolized the market for blast-resistant vehicles by boasting superior products and rapid delivery rates. ***But a damaging government report, published late last month by the Office of the Inspector General, raises questions about both claims.***
>
> ***For starters, the OIG report suggests that another company offered a suitable vehicle -- with a faster delivery schedule -- even though the military singled out Force Protection as the only viable contender when awarding the company big contracts without seeking competitive bids. Moreover, the report claims that Force Protection repeatedly missed delivery deadlines -- despite an expansion project financed by the government -- and escaped mandated penalties because of threats to the company's cash flow and overall financial condition.***
>
> ***The government's financial assistance supposedly came with strings attached. With 98% of its orders missing deadlines by early 2006, the report estimates, Force Protection faced up to $6.6 million in liquidated damages. Force Protection would have struggled to cover those extra costs, since -- even without them -- its auditors raised concerns about the company's ability to survive just a few months later. Losing the military as its only customer might have killed the company altogether.***
>
> ***Instead, Force Protection not only dodged expensive fines but also went on to score additional vehicle contracts and emerge as the leader in a field now crowded with larger competitors. Force Protection, through a joint-venture with heavyweight defense contractor General Dynamics GD, currently ranks as the biggest winner under the military's multibillion-dollar Mine-Resistant Ambush-Protected vehicle program.***
>
> Force Protection did not immediately respond to a telephone message left by TheStreet.com Thursday morning. However, the company seemed almost apologetic when discussing the situation with Bloomberg News the previous afternoon.
>
> "We have continually given the government our most aggressive, best delivery schedule," Michael Aldrich, Force Protection's vice president of government relations, told Bloomberg News on

Wednesday. "With increasing numbers and a more complex flow of materials, it is inevitable that our most aggressive schedule will be disrupted from time to time by lack of critical materials."

*However, Aldrich conceded, "because we've been late, we need to provide compensation to the government, and we are negotiating on that."*

*Meanwhile, Force Protection has failed to monopolize MRAP -- as many analysts expected -- after the company missed its early deadlines and the military started welcoming other bidders. Moreover, the company faces mounting competition and calls for sturdier vehicles as it seeks to maintain its leadership position under a greatly expanded MRAP II program.*

Still, until now, the government has complained little about Force Production's delivery delays. Indeed, in a February article published by the Marine Corps Times, Marine spokesman Bill Johnson-Miles singled out Force Protection as one of two companies that "have shown their reliability to produce vehicles, meaning they meet Marine Corps Systems Command survivability, production number and delivery timeline requirements."

*At the same time, Force Protection itself has been boasting about "record" production rates and the company's ability to meet -- and even exceed -- tight deadlines. But David Phillips, a financial expert known as the "10-Q Detective," has always felt skeptical about Force Protection's claims.*

*"The company was so concerned with living up to the hype that it kept booking contract after contract," says Phillips, who has no position in Force Protection's stock himself. "But I never felt that management had the skill set -- or that the company had the manufacturing capacity -- to follow through on that volume."*

Force Protection insiders haven't exactly displayed total confidence in the company, either. Notably, even as Force Protection touted its achievements, insiders were busy dumping loads of company shares. Thanks to stock sales, in fact, Force Protection's longtime chairman recently retired from his post as a multimillionaire.

Bulls like to argue that Force Protection executives sold their stock under prearranged plans. However, bears counter that those executives are free to cancel future sales -- and might want to if they expected the stock to climb -- any time they wish.

To be fair, ordinary shareholders have gotten rich on Force Protection's meteoric rise as well. But Phillips, for one, worries

that investors could pay a steep price for their trust in company management in the end.

> *"The stock went from $3 to $30 on the expectation that the company was delivering the goods," he says. "But to be honest -- as the Pentagon pointed out -- the company did not deliver on its promises."*

> After dropping sharply in early trading, Force Protection shares bounced back Thursday to rise a dime to $22.79. [Emphasis added.]

38.    On July 12, 2007, Force Protection filed an amended Form 10-K.  The Form 10-K contained substantially similar certifications as those contained in the Company's Form 10-Q for second quarter 2006.

39.    On July 13, 2007, the Company issued a press release entitled "Force Protection, Inc. Offers Comment On Report by Pentagon's Inspector General."  Therein, the Company, in relevant part, stated:

> Force Protection, Inc. (NASDAQ:FRPT) today offered comment on a June 27 report issued by the Pentagon's Inspector General that criticized the U.S. Marine Corps for awarding sole source armored vehicle contracts to the company in 2005 despite delays in delivering the vehicles on schedule.

> "Like all Americans, we are disappointed with some of the findings in the Inspector General's report," said Force Protection CEO Gordon McGilton. "From its beginnings, Force Protection's objective has been to provide the finest lifesaving vehicles in the world. We have consistently operated under urgent operational needs and have sought diligently to meet government requirements under extremely short timeframes. *However, we believe that recent press coverage on the report has missed some key findings. As stated clearly on page 26, 'the Cougars and the JERRVs proved to have significant and operational value to our warfighters on the field.' The report also states that 'We reviewed documentation from users and classified data on vehicle performance and learned that the vehicles performed well and saved lives.'*

> "*When past delivery delays have occurred it has been representative that even a minor glitch in the supply chain can*

18

*push things back under such tight parameters," McGilton said. "Enormous progress has been made in fielding this proven, battlefield solution years ahead of traditional defense schedules. Tens of thousands of our servicemen and women are alive and have reunited with their families and friends at home because of the protection provided by our vehicles. Force Protection will continue to work with the Department of Defense to produce and improve upon the best blast and ballistic protection technology in the world."*

Force Protection's vehicles have become the gold standard in troop protection against IEDs, roadside bombs, and land mines. The vehicles have logged more than three million hours of heavy combat operations and withstood thousands of blast attacks in Iraq and Afghanistan since 2003.

Force Protection is a leading ballistics research and manufacturing enterprise, specializing in the development and production of highly reinforced armored personnel carriers that are designed to save soldiers' lives by shielding them from the deadly effects of roadside bombs, or IEDs, which have become a leading killer of U.S. troops in Iraq. The trucks' unique, V-shaped hull is designed to deflect the force of IED blasts away from the vehicle, keeping soldiers inside safe and alive, and have become the proven response to an emerging global threat to U.S. troops. Its leading models include the 23 ton "Buffalo", a uniquely-designed mine clearance vehicle with a reinforced mechanical arm, and the family of "Cougar" vehicles, both of whose mine and ballistic protection capabilities are among the most advanced in the world. [Emphasis added.]

40.    On July 19, 2007, Force Protection filed an amended Form 10-Q with the SEC. The Form 10-Q contained substantially similar certifications as those contained in the Company's Form 10-Q for second quarter 2006.

41.    As a result of these partial disclosures, shares of the Company's stock steadily declined from as high as over $30 a share on May 30, 2007 to a closing price of $15.41 on July 30, 2007.

42.    On August 9, 2007, the Company issued a press release entitled "Force Protection Reports Record Second Quarter and Six Month 2007 Financial Results." Therein, the Company,

in relevant part, stated:

> Force Protection (NASDAQ: FRPT), today announced results for its second quarter and six months ended June 30, 2007.
>
> ***Net sales for the second quarter of 2007 rose 140% to $134.7 million, compared to net sales of $56.1 million for the second quarter of 2006. Net sales for the six month period ended June 30, 2007 were $234.9 million, compared to $90.9 million for the first six months of 2006, a 158% increase. The primary reason for the increase in sales was due to the improving production capability leading to increased deliveries and sales of its Cougar and Buffalo vehicles.***
>
> For the second quarter gross profit was $32.8 million, or 24.3% of net sales, compared to a gross profit of $10.2 million, or 18.1% of net sales for the second quarter of 2006. As a percentage of net sales gross margin increased 6.2% over second quarter 2006. Gross profit for the first six months of 2007 was $55.3 million, or 23.5% of net sales, compared to a gross profit of $16.8 million, or 18.5% of net sales for the first six months of 2006. As a percentage of net sales gross margin increased 5.0% for the first six months of 2007, compared to the same period last year. The gross profit increase for the second quarter and six month period was primarily due to improved material and labor costs and the Company's increased ability to leverage fixed costs as it continues to expand its production capability.
>
> Research and development (R&D) expenses increased 416% to $3.3 million, compared to $641,215 for second quarter 2006. For the first six months of 2007, R&D rose 524% to $8.1 million, compared to $1.3 million for the first six months of 2006 primarily due to continued development of the Cheetah vehicle. The company previously announced the acquisition of an additional facility for the manufacture of current and future products including the Cheetah and expects the production capacity to be approximately 2,000 Cheetah vehicles in 2008 as previously stated.
>
> Expansion efforts continue and are on track to provide increased capacity at our facilities in Ladson, SC, Roxboro, NC and the various facilities within our enterprise which will enable us to meet previously stated production capacity within our operations.
>
> The Company recorded an operating profit of $13.9 million for the quarter, compared to an operating profit of $1.8 million for the second quarter of 2006. Operating profit was $16.5 million for the

first half of 2007, compared to an operating profit of $1.8 million for the first half of 2006.

Income after taxes for the second quarter was $9.6 million, compared to income after taxes of $973,024 for the same quarter last year, a 889% increase. For the six month period ended June 30, 2007, the Company reported income after taxes of $12.1 million, compared to income after taxes of $205,575 for the first six months of 2006.

Net income for the quarter rose 2,170% to $9.6 million, or $0.14 per diluted share, compared to net income of $424,047 or $0.01 per diluted share for the same period last year. Net income for the six month period was $12.1 million, or $0.18 per diluted share, compared to net loss of $(989,267) or $(0.03) per diluted share for the same period last year. The Company incurred a $1.7 million charge for the late registration of the private placement during the second quarter 2007, or $0.025 per diluted share. Excluding this charge, EPS would have been $0.17 per share. As earlier announced, the S-3 filing was declared effective on July 26, 2007.

Gordon McGilton, Chief Executive Officer of Force Protection commented, ***"We are most pleased with our results for the second quarter having realized significant increases in net sales, net income and gross profit. At the same time, we produced 229 vehicles in the second quarter compared to 285 vehicles in all of 2006."***

***"We were also pleased to have signed several additional contracts during the quarter in connection with our joint venture with General Dynamics. During the quarter, we announced that we had been awarded contracts totaling $711 million to produce 1,455 vehicles for the U.S Marine Corps' Mine Resistant Ambush Protected (MRAP) vehicle program.***

As previously announced, we received our first Canadian contract for approximately $8.9 million to produce five Buffalo and five Cougar mine-protected vehicles for the Canadian Expeditionary Force Command (CEFCOM). We recently delivered the first of these vehicles to the Canadian forces."

**Subsequent Events**

On July 20, 2007, we entered into an Agreement with Wachovia Bank for a revolving credit facility of $50,000,000. We entered into this agreement to assure continued flow of cash while administrative contractual payment issues are worked out with

government payment offices on recently established MRAP programs.

On August 1st, 2007, the Company announced a contract for approximately $5.3 million for continued work under the Iraqi Light Armored Vehicle (ILAV) program for new ILAV vehicles and equipment to include 22 new vehicles and more than 40 articulating interrogating arms.

Mr. McGilton concluded, ***"The progress that we have made to date in 2007 positions us for a successful year. As noted, we are continuing to see strong demand for our vehicles. We are also realizing the benefits of improved materials and labor costs and a reduction in our fixed costs. Most importantly we remain committed to our mission to make vehicles that protect and save lives by making sure that those vehicles are available to our troops in a timely manner."*** [Emphasis added.]

43.    On August 9, 2007, Force Protection filed its Quarterly Report with the SEC on Form 10-Q and reaffirmed the Company's financial results previously announced the same day. The Company's 10-Q also contained Sarbanes-Oxley required certifications, signed by Defendants McGilton and Durski, substantially similar to the certifications contained in ¶ 24, *supra*.

44.    On October 15, 2007, Force Protection filed its amended Yearly Reports for fiscal year ended December 31, 2005 and December 31, 2006 with the SEC on Form 10-K.  The Company's 10-Ks was signed by the Defendants McGilton and Durski and contained Sarbanes-Oxley required certifications, substantially similar to the certifications contained in ¶ 24, *supra*. Additionally, the Company, in its restated 2006 10-K, in relevant part, stated:

Based on this assessment, our management identified the following material weaknesses in the Company's internal control over financial reporting as of December 31, 2006:

***Our financial and accounting organization was not adequate to support our financial accounting and reporting needs. Specifically, we did not maintain a sufficient complement of personnel with an appropriate level of accounting knowledge, experience with the Company and training in the application of***

***GAAP commensurate with our financial reporting requirements. The lack of a sufficient complement of personnel with an appropriate level of accounting knowledge, experience with our Company and training contributed to the control deficiencies noted below.***

(1)    We did not maintain effective policies and procedures related to the accounting for specific equity issuances, including accounting for stock-based compensation in accordance with Statement of Financial Accounting Standard ("SFAS") No. 123, Share-Based Payment , and accounting for convertible and redeemable preferred stock and warrants. This deficiency resulted in errors in the Company's accounting and disclosures for these equity issuances and related earnings per share calculations.

(2)    We did not maintain effective controls to ensure the accuracy of disclosures in our financial statements and classification of certain financial transactions in the financial statements. Specifically, we failed to classify the allowance for contractual adjustments as a reduction in receivables and had incorrect or inadequate disclosures in financial statement disclosures related to the non-recurring warranty, statement of shareholders' equity, deferred tax assets, liabilities and related income tax expense, contingency losses, discontinued operations, receivables and factoring accounts, debt and the statement of cash flows in our financial statements.

The control deficiency described above in (1) resulted in the restatement of our annual consolidated financial statements for 2005, 2004, and 2003. The control deficiency described in (2) required amendment of our annual financial statements for the years 2005, 2004 and 2003 which are included in our amended 2005 Form 10-K filing. The control deficiency related to earnings per share in (1) resulted in restatement of the 2006 earnings per share calculations in the annual financial statements in the amended 2006 Form 10-K. Additionally, these control deficiencies could result in a misstatement in our annual or interim consolidated financial statements that would not be prevented or detected. Management has determined that each of the control deficiencies described above constitutes a material weakness.

***These deficiencies result in more than a remote likelihood that a material misstatement of the Company's annual or interim financial statements would not be prevented or detected. Management has taken or plans to take steps to improve our internal control over financial reporting*** (see below).

> *As a result of the material weaknesses, our management has concluded that our internal control over financial reporting was not effective as of December 31, 2006.* [Emphasis added.]

45.    On November 13, 2007, Force Protection filed its Quarterly Report with the SEC on Form 10-Q. The Company's 10-Q was signed by Defendants McGilton, Durski and Pollard. Additionally, the Company, in relevant part, stated:

> Our management evaluated, with the participation of our Chief Executive Officer and our Chief Financial Officer, the effectiveness of our disclosure controls and procedures as of the end of the period covered by this quarterly report on Form 10-Q. Based on this evaluation, and in light of the material weaknesses in our internal control over financial reporting that are discussed in our Annual Report on Form 10-K for the fiscal year ended December 31, 2006, as amended, our Chief Executive Officer and our Chief Financial Officer have concluded that our disclosure controls and procedures, including internal control over financial reporting, were not effective to ensure that information we are required to disclose in reports that we file or submit under the Securities Exchange Act of 1934, as amended (i) is recorded, processed, summarized, and reported within the time periods specified in Securities and Exchange Commission rules and forms, and (ii) is accumulated and communicated to our management, including our Chief Executive Officer and our Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure. Our disclosure controls and procedures are intended to be designed to provide reasonable assurance that such information is accumulated and communicated to our management. *Our management concluded so, in part, because (1) we did not maintain effective policies and procedures related to the accounting for specific equity issuances, including accounting for stock-based compensation in accordance with statement of Financial Accounting Standard ("SFAS") No. 123, Share-Based Payment , and accounting for convertible and redeemable preferred stock and warrants. This deficiency resulted in errors in the Company's accounting and disclosures for these equity issuances and related earnings per share calculations. (2) We did not maintain effective controls to ensure the accuracy of disclosures in our financial statements and classification of certain financial transactions in the financial statements. Specifically, we failed to classify the allowance for contractual adjustments as a reduction in receivables and had incorret or inadequate disclosures in financial statement disclosures related to the non-recurring warranty, statement of shareholder's equity,*

*deferred tax assets, liabilities and related income tax expense, deferred tax assets, liabilities and related income tax expense, contingency losses, discontinued operations, receivables and factoring accounts, debt and the statement of cash flows in our financial statements. (3) As discussed below in changes in internal controls, during the third quarter, we have also encountered turnover in financial reporting personnel and implementation issues of our new Enterprise Resource Planning ("ERP") computer system.*

*     *     *

*We believe the following changes in internal control over financial reporting (as defined in Rule 13a-15(f) of the Securities Exchange Act of 1934) occurred during the third quarter of 2007 that materially affected or were, reasonably likely to materially affect our internal control over financial reporting.*

Throughout 2007 and including the third quarter of 2007, we have dedicated a significant amount of time and resources to revise our internal controls to remediate the material weaknesses noted in our Annual Report on Form 10-K/A filed on October 15, 2007 and to enhance existing internal controls because of our significant growth. We have added new in house legal counsel and key management in financial operations. Financial operations role is to focus on implementation of our new ERP system and its communication with all other significant business systems in the Company to ensure accurate financial reporting. We have also engaged a third party with expertise in internal controls to review documents and revise (as necessary) internal controls in an analysis of our key business operating systems.

In the third quarter of 2007, we implemented the inventory component of our ERP system and encountered issues in reconciliation of the physical inventory to the ERP system balances, requiring us to add additional manual controls to the process to correct these issues. This has delayed our implementation to the new ERP system. Also, we have encountered financial reporting personnel turnover in our financial reporting department which has delayed our quarterly reporting.

*     *     *

*We are now a large business and may be precluded from entering into new contracts with the U.S. government unless our financial and accounting systems are improved sufficiently to meet government standards.*

25

In order to enter into contracts with the U.S. military, a contractor's financial and accounting systems must generally meet the standards established by the Federal Acquisition Regulation ("FAR") and the Cost Accounting Standards ("CAS"). Compliance is usually reviewed by the Defense Contract Audit Agency ("DCAA"), an arm of the Department of Defense. Contractors who do not meet these standards generally are not eligible to win new contracts from the U.S. government.

*Because we previously were a small business, we were not required to comply with all of the financial and accounting requirements in order to enter into contracts with the U.S. military. However, as a result of the growth of our business, we are no longer a small business, and we therefore will be required to meet these additional financial and accounting standards. We have been advised by the DCAA that our financial and accounting systems do not meet these requirements and, although we have been seeking to improve these systems, we have extensive work remaining in order to meet these standards. There can be no assurance as to when we will be able to meet these standards and, until we are able to do so, we may not be eligible for new contract awards by the U.S. military. Accordingly, any failure to meet these standards will likely have a material adverse effect on our business.*

*The DCAA has issued audit reports that have been highly critical of our finances and financial accounting system, that have questioned our ability to perform our government contracts, and that have questioned or disallowed significant proposed charges under some of our government contracts.*

U.S. government agencies, generally through the DCAA, routinely audit and investigate government contracts and government contractors' administrative processes and systems. The audits may review the costs we incur on our U.S. government contracts, including allocated indirect costs. The auditor may also review our compliance with applicable laws, government regulations, policies and standards and the adequacy of our internal control systems and policies, including our purchasing, property, estimating, compensation and management information systems. An adverse finding under a DCAA audit could result in the disallowance of our costs under a U.S. government contract, termination of U.S. government contracts, forfeiture of profits, suspension of payments, fines and suspension or prohibition from doing business with the U.S. government. Any costs found to be improperly allocated or otherwise improperly accounted for may not be paid or reimbursed, and any such costs previously paid or reimbursed may

have to be refunded. We have recorded contract revenues based upon costs we expect to realize upon the final audit. However, we do not know the outcome of any future audits and adjustments and we may be required to reduce our revenues or profits upon completion and final negotiation of audits. If any audit uncovers improper or illegal activities, we may be subject to civil and criminal penalties and administrative sanctions, including termination of contracts, forfeiture of profits, suspension of payments, fines and suspension or prohibition from doing business with the U.S. government. In addition, responding to governmental audits may involve significant expense and divert management attention.

Moreover, if any of our administrative processes and systems are found not to comply with the applicable requirements, we may be subjected to increased government scrutiny or required to obtain additional governmental approvals that could delay or otherwise adversely affect our ability to compete for or perform contracts. Therefore, an unfavorable outcome to an audit by the DCAA or another government agency, could materially adversely affect our competitive position and result in a substantial reduction of our revenues.

The DCAA has issued a number of audit reports concerning some of our contracts with the U.S. military. These reports have generally been highly critical of our finances and financial accounting systems. The DCAA has issued at least eight audit reports on our operations and contracts from May of 2004 through October of 2007. Some of these audit reports focused on proposals that we submitted or on our accounting systems. With respect to our proposal submissions, DCAA has repeatedly found that we did not submit our proposals in the correct format, that required data were missing, and that our proposal often lacked a proper basis for the costs submitted. In several of these audits, DCAA found that our accounting systems were inadequate, that our books failed to reconcile our general ledger with our cost summaries, that our systems did not track and properly account for direct and indirect costs, and that our systems are unable to segregate pre-production and production costs. In addition, DCAA audit reports in September 2006 and March 2007 considered us to have an unfavorable financial condition.

On January 25, 2006, the U.S. Army Tank-automotive and Armaments Command ("TACOM") audited the company to evaluate the adequacy of our ISO-9001:2000 Quality System. The audit report identified critical areas of non-compliances and

weaknesses in our quality system of control and provided various recommendations to address the deficiencies.

The Company is taking steps to improve its financial systems and to address the issues raised by the DCAA, TACOM and the Department of Defense Inspector General. For example, we are implementing a new financial system,. Although we indicated in our responses to certain audit responses that we planned to have the system operational by July 2007, it is still not fully operational. There can be no assurance as to whether we will be able to address these issues to the satisfaction of these agencies and, if we are unable to do so, we may be subject to price reductions, contract terminations, civil and criminal penalties, and other sanctions, including forfeitures of profits, suspension of payments, fines and suspension or debarment from doing business with the federal government as a prime or subcontractor. Accordingly, any failure to meet these standards could have a material adverse effect on our business.

**The Inspector General of the U.S. Department of Defense has issued a report questioning the award of sole source contracts to us and criticizing our performance.**

Because of the need to accelerate deliveries of blast resistant vehicles to U.S. forces in Iraq, certain of our contracts with the U.S. government were awarded to us on a "sole source" basis, meaning that our competitors were not permitted to bid for the contracts. In a report dated June 27, 2007, the Inspector General of the U.S. Department of Defense criticized the award of these contracts without competitive bidding, noting that there were other vehicles that could have competed with our Cougar vehicle, and recommended that future contracts for JERRV vehicles be awarded through a competitive bidding process. The report further indicated that the U.S. Marine Corps agreed that future contracts should be awarded through competitive bidding. To the extent that future U.S. military contracts for blast resistant vehicles are subjected to competitive bidding, it is likely that a number of other companies, most of which have substantially greater resources than we do, will bid for those contracts. Accordingly, the use of competitive bidding could have a material adverse effect on our ability to obtain future awards and contracts and on our operating results, cash flow, liquidity and prospects.

The report further indicates that we "did not perform as a responsible contractor and repeatedly failed to meet contractual delivery schedules." The criticism that we did not perform as a "responsible contractor" indicates that, in the view of the Inspector

General of the Department of Defense, our performance under the contracts reviewed in the report did not meet the requirements of the federal regulations establishing "responsibility" as a prerequisite to qualifying for the award of U.S. government contracts. To the extent that Department of Defense officials in charge of the awarding of procurement contracts for our types of vehicles conclude that we are not "responsible," we would not be able to receive any such contracts.

In addition, in its description of the late delivery of vehicles by us, the report states that, of 233 Cougar, JERRV and Buffalo vehicles ordered by the Marine Corps under our contracts, 60% of the vehicles were delivered more than 30 days late under their original delivery schedules and that a substantial percentage were also more than 30 days late under revised delivery schedules. Moreover, in a contract relating to 122 JERRV vehicles, we agreed to pay liquidated damages of approximately $55,000 per vehicle (or a maximum of up to $6.7 million) in the event of late deliveries. The contract schedules were bilaterally modified and any liquidated damages that were due for late deliveries were paid by us. The report recommends that the U.S. military include in future contracts and enforce a provision requiring us to pay liquidated damages for late deliveries, which also could require us to make substantial payments and adversely affect our liquidity and results of operations. None of our current active contracts provide for liquidated damages. [Emphasis added.]

46.    On November 14, 2007, the Company issued a press release entitled "Force Protection Reports Record Third Quarter and Nine Month 2007 Financial Results." Therein, the Company, in relevant part, stated:

Force Protection, Inc. (NASDAQ: FRPT) today announced results for its third quarter and nine months ended September 30, 2007.

***The Company reported net sales for the third quarter of $206.3 million, a 389% increase, compared with net sales of $42.2 million for the third quarter of 2006. Net sales for the first nine months of 2007 rose 232% to $441.2 million, compared with net sales of $133.0 million for the first nine months of 2006. The sales increase for both periods was a result of increased deliveries of Force Protection's Cougar and Buffalo vehicles. This includes increased production of vehicles by our joint venture partner General Dynamics Land Systems (GDLS), whose sales of Cougar vehicles under the mine resistant ambush protected (MRAP) program are included in our net sales.***

The Company's third quarter 2007 results included approximately $33.3 million of net sales attributed to vehicles produced by GDLS under the December 15, 2006 joint venture requiring the company to award fifty percent (50%) of the MRAP Cougar vehicle production work to GDLS. Pursuant to the joint venture and a subcontract issued in support thereof, GDLS charges the Company an amount per vehicle that is equal to the revenue the Company receives from the Government, which increased the Company's cost of sales for the third quarter of 2007 by a corresponding $33.3 million. Including the revenues as cost of vehicles manufactured by GDLS results in a decreased gross margin percentage, but has no impact on our absolute dollars of gross margin. Until such time as the MRAP contract is novated to the joint venture, vehicles produced by GDLS will be reported by the Company in sales and cost of sales.

Net earnings available to common shareholders for the third quarter of 2007 increased to $11.4 million, or $0.16 per diluted share, compared with net income of $239,943, or $0.0 per diluted share for the third quarter of last year. Net earnings available to common shareholders for the nine month period of 2007 was $23.5 million, or $0.34 per diluted share, compared with a net loss of $(749,324), or $(0.02) per diluted share for the same period last year.

Gross profit for the third quarter of 2007 was $40.6 million, or 19.7% of net sales, compared with a gross profit of $7.9 million, or 18.8% of net sales for the third quarter of 2006. For the first nine months of 2007, the Company reported gross profit of $95.9 million, or 21.7% of net sales, compared with a gross profit of $24.7 million, or 18.6% for the prior year period. The gross profit increase for the third quarter and nine months was primarily due to improved material and labor costs and the Company's increased ability to leverage fixed costs as it continues to expand production.

The Company recorded an operating profit of $18.1 million for the third quarter 2007, compared with an operating profit of $657,372 for last year's third quarter. Operating profit was $34.6 million for the nine month period ended September 30, 2007, compared with $2.4 million for the first nine months of 2006.

Cash flow for the first nine months of 2007 decreased by $84.0 million, compared with an increase of $25.5 million for the same nine month period in 2006. The 2007 decrease is primarily due to increased working capital and approximately $44 million in capital expenditures to support higher production volumes.

Gordon McGilton, Chief Executive Officer commented, *"We are most pleased with the results for our third quarter and nine month periods, where we once again posted strong improvement in net sales, net income and gross profit. During the quarter we, together with our partners, produced 374 vehicles, compared with 58 vehicles for the same quarter last year."*

"During the quarter we received a follow-on order totaling approximately $69 million from the U.S. Marine Corps for an additional 125 Cougar Category I and II vehicles for the MRAP program. The vehicles due under this order, twenty-five Category I, plus 100 Category II MRAPs are planned to be delivered by the end of 2007. Approximately 50% of the work under this order will be performed by GDLS."

Further, Mr. McGilton noted, *"The Company continues to focus time and resources on managing the complexities of exponential growth which the Company has experienced. We are continuing to balance this successful growth with the maturation of our Business Operating System."* [Emphasis added.]

47.    On December 19, 2007, the Company issued a press release entitled "Force Protection Awarded $379 Million MRAP Contract, Additional Sales Orders to Follow." Therein, the Company, in relevant part, stated:

*Force Protection, Inc. (NASDAQ:FRPT - News) today announced it has received a delivery order for an additional 358 Mine Resistant Ambush Protected (MRAP) Category I and Category II vehicles from the U.S. Marine Corps Systems Command (MARCORSYSCOM), which is acting as the lead contracting agency for the Department of Defense. The total approximate value of the order is $379 million.*

MARCORSYSCOM also advised Force Protection that its Cheetah vehicle proposal is in the competitive range for continued development and testing and will be further evaluated with modifications as part of the ongoing MRAP II competition.

*"In addition to this order from the Marine Corps Systems Command, we intend to continue working with the Army to field the Cougar vehicle in a way that will meet the Army's objective of reducing sustainment and life cycle expense," said Gordon McGilton, CEO of Force Protection, Inc. "The MRAP vehicle program requirements are based on the very design characteristics of our Cougar and Buffalo – the most proven and*

31

*effective vehicles of this kind in service, and the Army continues to be a valued customer under the MRAP Category III Buffalo program. We are in the process of finalizing a contract for the Buffalo route clearance vehicles to be part of the Ground Standoff Mine Detection System (GSTAMIDS) program of record.*

"We are pleased that the Marine Corps, Navy, and Air Force continue to select our proven Cougar MRAP for their Category I and II vehicle requirements," said McGilton. "The Cougar JERRV variant is already meeting joint service requirements for explosive ordnance disposal teams and continues to be the gold standard in performance where it matters most—on the battlefield."

In related activities, foreign military sales have also been approved to the United Kingdom and Italy for approximately 300 Cougar and Buffalo vehicles. These contracts have a combined estimated value of $150 million, and include spare parts and sustainment items.

"As U.S. requirements for MRAP vehicles rise and fall, we are pleased to see the release of orders to foreign militaries," said McGilton. "We are aware of several other countries who have expressed additional need for these life saving vehicles, and we expect to receive approval to service them as well."

Deliveries for Cougar Category I and II vehicles in the MRAP program are executed through the company's joint venture, Force Dynamics, LLC, with General Dynamics Land Systems (NYSE:GD - News). As reported at the end of November, Force Dynamics is 68 vehicles ahead of the contracted MRAP delivery schedule. Buffalo Category III vehicles are sole-sourced to Force Protection and produced independently in Ladson, SC. [Emphasis added.]

48.    On December 19, 2007, the *MarketWatch* published an article entitled "Force

Protection loses ground to rivals."  Therein, the Company, in relevant part, stated:

*Shares of Force Protection Inc. fell as much as 34% Wednesday after the Defense Department's latest order for its heavily armored trucks came in much lower than expected, worrying investors that the Pentagon is increasingly turning to contractors that can build on well-established supply and maintenance programs.*

The military said late Tuesday that it would buy an additional 3,126 armored trucks for $2.66 billion, bringing its total order to 11,941 vehicles for delivery by mid-summer. The largest contract in the new order went to Navistar International Corp.

\*     \*     \*

***Shares of Force Protection closed Wednesday at $4.93, down more than 16%. Earlier the stock traded at a new 52-week low of $3.89.***

The Pentagon's decision to award the bulk of new MRAP orders to Navistar highlights a broader theme in modern militaries: a desire for different types of field equipment to share parts to bolster parts availability, cut down service costs and improve performance.

International Military and Government and its parent Navistar already supply heavy trucks to the military for transport and freight, and its MaxxPro MRAP uses a similar engine and chassis.

"We are able to bring forward a scale of commercial-truck and engine manufacturing they don't currently have," a spokesman for the company said. "Generally speaking, the trucks and the MRAP are the same."

Additionally, International Military has more than 1,000 parts and service providers across the world, including dealerships in Iraq and Afghanistan.

***"MRAP orders were historically based on who could produce the number the DoD wanted, but greater concern was later based upon commonality with other existing vehicles in the fleet,"*** said Patrick McCarthy, an analyst for Friedman, Billings, Ramsey.

***On Monday, McCarthy lowered his rating for Force Protection to underperform from market perform on concerns that the company wouldn't win as many MRAP orders as expected, because its vehicles don't share as many parts with vehicles already in the military's fleet.***

***Before this week, McCarthy had expected the company to win as much as 40% of the new contracts.***

***"Commonality is becoming more important, because it enables the military to leverage spare and maintenance capabilities across more types of vehicles, lowering longer-term logistics costs,"*** he said. [Emphasis added.]

49.     Following these reports, shares of the Company's stock fell $0.98, or 16.58 percent, to close on December 19, 2007 at $4.93 per share.

50.     The statements contained in ¶¶ 39-40, 42-43, and 45-47 were materially false and misleading when made for the reasons stated in ¶ 35, *supra*.

## **The Truth Emerges**

51.     On February 29, 2008, after the market closed, the Company issued a press release entitled "Force Protection Announces Delay in 2007 Form 10-K and Required Restatement of Form 10-Q for the Period Ended September 30, 2007." Therein, the Company, in relevant part, stated:

> ***Force Protection, Inc. (NASDAQ:FRPT) today announced that it will delay the filing of its Annual Report on Form 10-K for the year ended December 31, 2007. The Company intends to file its Annual Report on Form 10-K for the year ended December 31, 2007 with the SEC promptly upon the completion of the audit of the consolidated financial statements for the year ended 2007.***

> ***Force Protection today also announced that the Company's Audit Committee concluded that the Company will restate its previously reported interim financial statements for the three and nine month periods ended September 30, 2007. The Company will file a Form 8-K with the Securities and Exchange Commission with regard to this restatement decision.***

> The Company reached the conclusion to restate based upon the recommendation of management and the concurrence of the Audit Committee of the Company's Board of Directors. The Company also discussed the matters related to the restatement with Elliott Davis, LLC, the Company's current independent registered public accounting firm. ***Therefore, the previously issued financial statements of the Company for the third quarter of 2007 filed on a Form 10-Q on November 13, 2007 should no longer be relied upon. Management discovered significant accounting errors during its year end review, including errors specifically related to the recording of accounts payable related to inventory purchased from a sub-contractor as a result of a contract termination.***

> The Company continues to evaluate the impact of the matters described above on its internal control over financial reporting and

the Company's disclosure controls and procedures. Management noted it had previously identified and described material weaknesses in its internal control over financial reporting in its Quarterly Report on Form 10-Q filing dated November 13, 2007. As a result of these previously identified material weaknesses and other deficiencies identified during the review of financial statements for the year ended December 31, 2007, management has concluded internal controls over financial report were not effective as of December 31, 2007. Additionally, management does not believe that the material weaknesses identified as of December 31, 2007 will be remediated by March 31, 2008 and anticipates that material weaknesses will be identified in its Quarterly Report on Form 10-Q for the first quarter of 2008. Therefore, management expects that internal control over financial reporting is likely to be ineffective as of March 31, 2008. [Emphasis added.]

52.    On March 3, 2008, Force Protection filed a Form 12b-25 with the SEC. Therein,

the Company, in relevant part, stated:

> *Force Protection, Inc. (the "Company") has determined that it is unable to file its Annual Report on Form 10-K for the year-ended December 31, 2007 by the prescribed due date. As described in further detail below, the Company requires additional time to complete its evaluation of its internal control over financial reporting and preparation of the consolidated financial statements. The Company intends to file its Annual Report on Form 10-K for the year ended December 31, 2007 with the SEC promptly upon the completion of the audit of the consolidated financial statements for the year ended 2007 although it is possible that it will not be filed on or before March 17, 2008. In turn, Elliott Davis, LLC, the Company's independent registered public accounting firm, requires additional time to complete its audit procedures in order to provide the Company with its audit report on the audit of the financial statements and of the Company's internal control over financial reporting.*

> Although management has not yet completed its evaluation of the Company's internal control over financial reporting, management had, as of December 31, 2007, identified the following material weaknesses in internal control over financial reporting:

> ·    *Ineffective control over the financial statements closing process;*

·    *Ineffective controls in accounting for inventory and the associated accounts payable expenses related to the receipt of inventory;*

·    *Insufficient complement of personnel with an appropriate level of accounting knowledge, experience with the Company, and training in the application of general accepted accounting principles (GAAP) in the United States; and*

·    *Ineffective controls over the completeness and accuracy of deferred tax balances.*

In accordance with Section 404 of the Sarbanes-Oxley Act of 2002, the Company has been assessing the effectiveness of its internal control over financial reporting that existed as of December 31, 2007. As management's required assessment of internal controls over financial reporting is not complete, it is possible that the Company will identify one or more additional material weaknesses which, individually or in the aggregate, would constitute a material weakness in internal controls over financial reporting in accordance with Section 404 of the Sarbanes Oxley Act of 2002. Management has concluded that as a result of above-described the material weaknesses, internal controls over financial reporting are not effective as of December 31, 2007. Management also does not believe that the material weaknesses, or other deficiencies which may be identified, will be remediated by March 31, 2008. Therefore, the Company expects that internal control over financial reporting is likely to be ineffective as of March 31, 2008 and anticipates that material weaknesses will be identified in its Quarterly Report on Form 10-Q for the first quarter of 2008.

In addition, the Company has also determined that its previously filed interim financial statements for the three and nine month periods ended September 30, 2007 and all public communications of such financial statements should no longer be relied upon because those financial statements contain material misstatements of net income. Accordingly, the Company plans to restate its historical financial statements for the quarter ended September 30, 2007 and the Company is also reviewing its historical financial statements for the quarter ended June 30, 2007. The Company is working to complete the restatement of its financial statements for the quarter ended September 30, 2007 and to prepare its financial statements for the year ended December 31, 2007. The Company is also reviewing its accounting procedures and controls, and the financial reporting processes.

As a result of the scope of the work to be performed to complete its analysis and to identify the material weaknesses in the Company's internal control over financial reporting, including the need to restate its financial statements, it is not practicable for the Company to file its Annual Report on Form 10-K for the fiscal year ended December 31, 2007 by the prescribed due date. The Company is working as expeditiously as possible to finalize the financial statements for the fiscal year ended December 31, 2007 and to file amendments to its previously filed Quarterly Report on Form 10-Q for the quarter ended September 30, 2007. [Emphasis added.]

53.    On this news, the Company's shares fell $0.53 per share, or 12.9 percent, to close on March 3, 2008 at $3.58 per share, on unusually heavy trading volume.

## FORCE PROTECTION'S VIOLATION OF GAAP RULES IN ITS FINANCIAL STATEMENTS FILED WITH THE SEC

54.    These financial statements and the statements about the Company's financial results were false and misleading, as such financial information was not prepared in conformity with GAAP, nor was the financial information a fair presentation of the Company's operations due to the Company's improper accounting for, and disclosure about its revenues, in violation of GAAP rules.

55.    GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time. Regulation S-X (17 C.F.R. § 210.4 01(a) (1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. § 210.10-01(a).

56.    The fact that Force Protection will restate its financial statements, and disclosed

37

that these financial statements should not be relied upon is an admission that they were false and misleading when originally issued (APB No.20, ¶¶7-13; SFAS No. 154, ¶25).

57.    Given these accounting irregularities, the Company announced financial results that were in violation of GAAP and the following principles:

(a)    The principle that "interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements" was violated (APB No. 28, ¶10);

(b)    The principle that "financial reporting should provide information that is useful to present to potential investors and creditors and other users in making rational investment, credit, and similar decisions" was violated (FASB Statement of Concepts No. 1, ¶34);

(c)    The principle that "financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events, and circumstances that change resources and claims to those resources" was violated (FASB Statement of Concepts No. 1, ¶40);

(d)    The principle that "financial reporting should provide information about an enterprise's financial performance during a period" was violated (FASB Statement of Concepts No. 1, ¶42);

(e)    The principle that "financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it" was violated (FASB Statement of Concepts No. 1, ¶50);

    (f)    The principle that "financial reporting should be reliable in that it represents what it purports to represent" was violated (FASB Statement of Concepts No. 2, ¶¶ 58-59);

    (g)    The principle that "completeness, meaning that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions" was violated (FASB Statement of Concepts No. 2, ¶79); and

    (h)    The principle that "conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered" was violated (FASB Statement of Concepts No. 2, ¶95).

58.    The adverse information concealed by Defendants during the Class Period and detailed above was in violation of Item 303 of Regulation S-K under the federal securities law (17 C.F.R. §229.303).

### PLAINTIFF'S CLASS ACTION ALLEGATIONS

59.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased Force Protection's common stock between August 14, 2006 and February 29, 2008 inclusive (the "Class Period") and who were damaged thereby. Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

60.    The members of the Class are so numerous that joinder of all members is

impracticable. Throughout the Class Period, Force Protection's common stock were actively traded on the National Association of Securities Dealers Automated Quotation ("NASDAQ"). While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Force Protection or, its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

61.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

62.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

63.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

>   (a)     whether the federal securities laws were violated by defendants' acts as alleged herein;
>
>   (b)     whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Force Protection; and
>
>   (c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

64.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

65.    The market for Force Protection's common stock was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements, and failures to disclose, Force Protection's common stock traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired Force Protection's common stock relying upon the integrity of the market price of Force Protection's common stock and market information relating to Force Protection, and have been damaged thereby.

66.    During the Class Period, defendants materially misled the investing public, thereby inflating the price of Force Protection's common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

67.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the

Class Period, defendants made or caused to be made a series of materially false or misleading statements about Force Protection's financial well-being and prospects. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Force Protection and its financial well-being and prospects, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein.

## LOSS CAUSATION

68.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

69.     During the Class Period, Plaintiff and the Class purchased Force Protection's common stock at artificially inflated prices and were damaged thereby.  The price of Force Protection's common stock significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

70.     As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, defendants, by virtue of their

receipt of information reflecting the true facts regarding Force Protection, their control over, and/or receipt and/or modification of Force Protection's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Force Protection, participated in the fraudulent scheme alleged herein.

71.    Throughout the Class Period, the defendants took advantage of the artificially inflated price of the Company's common stock in completing financing activities. For example, on December 20, 2006, the Company completed a private placement of 13 million shares of its common stock, and received net proceeds of $146.6 million by selling 13 million shares of its stock to institutional investors at a price of $11.75 per share.

72.    Additionally, during the Class Period, and with the Company's common stock trading at artificially inflated prices, Company insiders sold 6,406,513 shares of the Company's stock for gross proceeds of $89,413,000, including over $85 million in gross proceeds received by the Individual Defendants. This trading by Company insiders is evidenced by the following chart:

| Date of Trade | Inside Trader | Number of Shares | Price per Share | Gross Proceeds |
|---|---|---|---|---|
| May 31, 2007 | Kavanaugh, Frank | 31,243 | $30.78 - $30.78 | $962,000 |
| May 30, 2007 | Kavanaugh, Frank | 80,100 | $30.28 - $30.28 | $2,425,000 |
| May 23, 2007 | Kavanaugh, Frank | 25,095 | $28.05 - $28.05 | $704,000 |
| May 22, 2007 | Kavanaugh, Frank | 134,905 | $29.69 - $29.69 | $4,005,000 |

| May 21, 2007 | Kavanaugh, Frank | 21,000 | $28.23 - $28.23 | $593,000 |
| May 15, 2007 | Kavanaugh, Frank | 6,000 | $26.44 - $26.44 | $159,000 |
| May 14, 2007 | Kavanaugh, Frank | 23,000 | $27.80 - $27.8 | $639,000 |
| April 26, 2007 | Kavanaugh, Frank | 129,801 | $23.13 - $23.13 | $3,002,000 |
| April 25, 2007 | Kavanaugh, Frank | 73,570 | $23.31 - $23.31 | $1,715,000 |
| April 24, 2007 | Kavanaugh, Frank | 546,629 | $24.04 - $24.04 | $13,141,000 |
| January 26, 2007 | McGilton, Gordon R. | 215,001 | $20.05 - $20.05 | $4,311,000 |
| January 25, 2007 | McGilton, Gordon R. | 216,000 | $20.32 - $20.32 | $4,389,000 |
| January 24, 2007 | McGilton, Gordon R. | 569,000 | $19.68 - $19.68 | $11,198,000 |
| December 28, 2006 | Kavanaugh, Frank | 52,410 | $17.87 - $17.87 | $937,000 |
| December 27, 2006 | Kavanaugh, Frank | 22,590 | $17.23 - $17.23 | $389,000 |
| December 26, 2006 | Kavanaugh, Frank | 82,000 | $17.07 - $17.07 | $1,400,000 |
| December 22, 2006 | Kavanaugh, Frank | 293,000 | $17.57 - $17.57 | $5,148,000 |
| December 21, 2006 | Kavanaugh, Frank | 330,000 | $15.20 - $15.2 | $5,016,000 |
| November 21, 2006 | Kavanaugh, Frank | 68,000 | $10.70 - $10.7 | $728,000 |

| November 20, 2006 | Kavanaugh, Frank | 372,000 | $11.38 - $11.38 | $4,233,000 |
|---|---|---|---|---|
| October 11, 2006 | McGilton, Gordon R. | 122,600 | $8.11 - $8.11 | $994,000 |
| October 10, 2006 | McGilton, Gordon R. | 77,400 | $8.17 - $8.17 | $632,000 |
| October 9, 2006 | McGilton, Gordon R. | 100,000 | $8.38 - $8.38 | $838,000 |
| October 5, 2006 | Kavanaugh, Frank | 287,277 | $8.11 - $8.11 | $2,330,000 |
| October 4, 2006 | Kavanaugh, Frank | 114,123 | $8.48 - $8.48 | $968,000 |
| October 3, 2006 | Kavanaugh, Frank | 178,600 | $8.55 - $8.55 | $1,527,000 |
| September 26, 2006 | McGilton, Gordon R. | 83,333 | $8.77 - $8.77 | $731,000 |
| September 25, 2006 | Ervin, Scott R. | 197,336 | $8.90 - $9.1 | $1,776,000 |
| September 22, 2006 | Ervin, Scott R. | 129,500 | $8.90 - $9.05 | $1,162,000 |
| September 21, 2006 | Ervin, Scott R. | 134,000 | $8.99 - $9.14 | $1,215,000 |
| September 18, 2006 | Kavanaugh, Frank | 84,865 | $7.98 - $7.98 | $677,000 |
| September 15, 2006 | Kavanaugh, Frank | 599,640 | $7.48 - $7.48 | $4,485,000 |
| September 14, 2006 | Kavanaugh, Frank | 213,905 | $7.09 - $7.09 | $1,517,000 |
| September 13, 2006 | Kavanaugh, Frank | 101,590 | $7.21 - $7.21 | $732,000 |
| September 12, 2006 | Kavanaugh, Frank | 119,750 | $7.36 - $7.36 | $881,000 |

| September 11, 2006 | Kavanaugh, Frank | 119,750 | $7.01 - $7.01 | $839,000 |
| September 7, 2006 | Kavanaugh, Frank | 247,035 | $6.56 - $6.56 | $1,621,000 |
| September 6, 2006 | Kavanaugh, Frank | 87,465 | $6.75 - $6.75 | $590,000 |
| September 5, 2006 | Kavanaugh, Frank | 117,000 | $6.87 - $6.87 | $804,000 |
| | **TOTAL:** | **6,406,513** | | **$89,413,000** |

### Applicability of Presumption of Reliance:
### Fraud On The Market Doctrine

73.     At all relevant times, the market for Force Protection's common stock was an efficient market for the following reasons, among others:

(a)     Force Protection's common stock met the requirements for listing, and were listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)     As a regulated issuer, Force Protection filed periodic public reports with the SEC and the NASDAQ;

(c)     Force Protection regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Force Protection was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the

sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

74.     As a result of the foregoing, the market for Force Protection's common stock promptly digested current information regarding Force Protection from all publicly-available sources and reflected such information in the price of Force Protection's common stock. Under these circumstances, all purchasers of Force Protection's common stock during the Class Period suffered similar injury through their purchase of Force Protection's common stock at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

75.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Force Protection who knew that those statements were false when made.

## FIRST CLAIM
### Violation of Section 10(b) of

## The Exchange Act and Rule 10b-5
## Promulgated Thereunder Against All Defendants

76.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

77.    During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Force Protection's common stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

78.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Force Protection's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

79.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Force Protection's financial well-being and prospects, as specified herein.

80.     These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a

course of conduct as alleged herein in an effort to assure investors of Force Protection's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Force Protection's future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Force Protection's common stock during the Class Period.

81.     Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

82.     The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such

defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Force Protection's financial well-being and prospects from the investing public and supporting the artificially inflated price of its common stock. As demonstrated by defendants' overstatements and misstatements of the Company's financial well-being and prospects throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

83.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Force Protection's common stock was artificially inflated during the Class Period. In ignorance of the fact that market prices of Force Protection's common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the common stock trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by defendants, but not disclosed in public statements by defendants during the Class Period, Plaintiff and the other members of the Class acquired Force Protection's common stock during the Class Period at artificially high prices and were damaged thereby.

84.     At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Force Protection was experiencing, which were not disclosed by defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Force Protection

common stock, or, if they had acquired such common stock during the Class Period, they would

not have done so at the artificially inflated prices which they paid.

85.     By virtue of the foregoing, defendants have violated Section 10(b) of the

Exchange Act and Rule 10b-5 promulgated thereunder.

86.     As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the

other members of the Class suffered damages in connection with their respective purchases and

sales of the Company's common stock during the Class Period.

**SECOND CLAIM**
**Violation of Section 20(a) of**
**The Exchange Act Against the Individual Defendants**

87.     Plaintiff repeats and realleges each and every allegation contained above as if

fully set forth herein.

88.     The Individual Defendants acted as controlling persons of Force Protection within

the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level

positions, and their ownership and contractual rights, participation in and/or awareness of the

Company's operations and/or intimate knowledge of the false financial statements filed by the

Company with the SEC and disseminated to the investing public, the Individual Defendants had

the power to influence and control and did influence and control, directly or indirectly, the

decision-making of the Company, including the content and dissemination of the various

statements which Plaintiff contends are false and misleading.  The Individual Defendants were

provided with or had unlimited access to copies of the Company's reports, press releases, public

filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after

these statements were issued and had the ability to prevent the issuance of the statements or

cause the statements to be corrected.

89.     In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

90.     As set forth above, Force Protection and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(a)     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: March 19, 2008                    Respectfully submitted,

                                   By:   s/ Steven W. Hamm_____
                                         Steven W. Hamm [Federal I.D. No. 1692]
                                         Email: shamm@richardsonplowden.com
                                         C. Jo Anne Wessinger Hill [Federal I.D. No. 7198]
                                         Email: jhill@richardsonplowden.com
                                         RICHARDSON PLOWDEN & ROBINSON, P.A.
                                         1900 Barnwell Street
                                         Columbia, SC 29201
                                         P.O. Drawer 7788
                                         Columbia, SC 29202
                                         (803) 771-4400
                                         (803) 576-3713 direct dial
                                         (803) 779-0016 fax

                                         **Attorneys for Plaintiff**